UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

TOWER AUTOMOTIVE
OPERATIONS USA I, LLC,

           Plaintiff,          Case No. 24-cv-10144
                                  Honorable Linda V. Parker

v.
VARI-FORM MANUFACTURING
INC.,
           Defendant.
_____/

## OPINION GRANTING PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION (ECF NO. 6)

On February 5, 2024, this Court entered an Order granting the motion for preliminary injunction filed by Plaintiff Tower Automotive Operations USA I, LLC ("Tower"). In the Order, the Court indicated it would be issuing a separate Opinion setting forth its reasoning for that decision. The Court does so, here.

### I.     Background

#### A.     *The Parties & Relevant Contract*

Tower is a leading manufacturer of engineered automotive structural components and assemblies, serving original equipment manufacturers (OEM). (ECF No. 6 at PageID. 210.) Defendant Vari-Form Manufacturing, Inc. ("Vari-Form") supplies highly specialized components for automotive bodies, chasses, and other automotive structural parts. (*See id.* at PageID. 210-11.)

In April 2015, Tower issued a Request for Quotation ("RFQ") for a part to be used in manufacturing the Jeep Wrangler platform for FCA US (now Stellantis), referred to as the "JL Program." (*See* ECF No. 14-1 at PageID. 302-03.)  The program life was identified as six years. (*Id.* at PageID. 302.)  The RFQ provided that any resulting purchase order expressly incorporates Tower's terms and conditions, which were available on request and on Tower's website. (*Id.* at PageID. 303.)  It further provided that the supplier would be responsible for supplying parts "for the life of the program." (*Id.*)

On June 16, 2015, Vari-Form, Inc. ("VF-1"), responded to the RFQ. (*See* ECF No. 14-2 at PageID. 304 at PageID. 305.)  Tower awarded VF-1 the business and issued Purchase Order NV5020 ("PO") on April 13, 2017. (ECF No. 14-3 at PageID. 316-17.)

The PO, like the RFQ, incorporated Tower's terms and conditions. (*Id.* at PageID. 316.)  According to those terms and conditions, as stated in the PO, the PO was "effective and expressly conditional on seller's assent to all terms and conditions in this purchase order that are additional to, or different from those stated in sellers [sic] quotation or other offering documents."[1] (*Id.*)  The PO

---

[1] The terms and conditions also indicated that "[a] Purchase Order does not constitute an acceptance by Purchaser of any offer or proposal by Seller, whether in Seller's quotation, acknowledgment, invoice or otherwise." (ECF No. 1 at PageID. 38, ¶ 1.A.)

indicated that the seller's delivery of goods would manifest its assent (*id.*), which was consistent with Tower's terms and conditions:

> A contract is formed on the date that Seller accepts the offer of Purchaser.  Each Purchase Order shall be deemed accepted upon the terms and conditions of such Purchase Order by Seller by shipment of goods, performance of services, commencement of work on goods, written acknowledgement, or any other conduct of Seller that recognizes the existence of a contract pertaining to the subject matter hereof.

(ECF No. 1 at PageID. 38, ¶ 1.B),.  The PO further specified the quantity as "100%" of Tower's requirements.  (*Id.* at 317; *see also* ECF No. at PageID. 39, ¶ 3.A.)

Between 2017 and 2019, VF-1 fulfilled orders pursuant to the PO.   The original PO listed a per unit price of $14.7576. (ECF No. 1 at PageID. 26.) However, subsequent revisions of the PO modified the per unit price to $14.6076. (*Id.* at PageID. 28-36.)

### B.   *Formation & Transfer of Business to Defendant*

In 2018, VF-1 was no longer able to continue normal operations due to financial difficulties.  (*See* ECF No. 17-4 at PageID. 507, ¶ 2.)  To avoid interruption in the supply of parts for the Jeep Wrangler, Stellantis formed Defendant Vari-Form Manufacturing, Inc. ("Vari-Form") to purchase some of the assets of VF-1.  (*See id.* at PageID. 507, ¶ 3.)  Vari-Form was incorporated under the laws of Canada. (*Id.*)

3

Beginning on January 8, 2019, VF-1 was reorganized under bankruptcy proceedings in Canada.  (ECF No. 17-6 at PageID. 519, ¶ 9.)  As part of these proceedings, VF-1 and Vari-Form entered into an Asset Purchase Agreement ("APA") on January 7, 2019, which was approved in the court proceedings.  (*Id.* at PageID. 521, ¶ 17; *see also* ECF Nos. 18-2 to 18-5.)  Under the Asset Purchase Agreement, Vari-Form assumed certain assets of VF-1, referred to as the "Transferred Assets."  (ECF No. 18-2 at PageID 614, § 2.1.)  Included in the Transferred Assets were *inter alia* "Designated Contracts" and "Transferred Contracts." (*See id.* at PageID. 615, §§ 2.1(h), (j).)  Assets not transferred to Vari-Form remained with VF-1.  (*See id.* at PageID. 616-17, § 2.2).  The PO was not identified as a Transferred Asset.[2]  (*See* ECF No. 14-6 at PageID. 368-71; ECF No. 18-9 at PageID. 1025.)

C.    *Post Bankruptcy and Extension of Jeep Program*

Nevertheless, after the APA closed and the bankruptcy proceedings terminated on March 15 and April 3, 2019, respectively (*see* ECF No. 17-6 at

---

[2] Vari-Form has provided the Court with a list of the "Designated Contracts" which were transferred to it pursuant to the APA.  (*See* ECF No. 14-6 at PageID. 368-71.) However, the APA distinguishes between Designated Contracts and "Transferred Contracts."  (*See* ECF No. 18-2 at PageID. 615, § 2.1(h), (j).)  The Schedule listing "Other Transferred Contracts," although part of the APA (*see id.* at PageID. 613), is not attached to the copy submitted to the Court (*see id., generally*).

PageID. 522 n.2, 524 ¶ 29), Vari-Form shipped parts to Tower pursuant to the PO.[3]
(*See* ECF No. 1 at PageID 33-36.)

In Spring 2023, Vari-Form learned that Stellantis was extending the life of
the Program to October 2027.  (*See* ECF No. 1 at PageID. 17, ¶ 31.)  On May 23,
2023, Vari-Form sent an e-mail to Tower, stating in part: "As we have been
advised the JL program is expected to be extended (Jan 2024-Oct 2027) we are
being proactive and submitting our re-quote for economics adjustments."  (*See*
ECF No. 6-2 at PageID. 234.)  Vari-Form quoted a price of $17.0536 per unit.  (*Id.*
at PageID. 235.)  Tower declined to accept any "re-quote" from Vari-Form.  (*See*
ECF No. 6 at PageID. 217.)

On December 8, 2023, Vari-Form wrote Tower requesting a new purchase
order in place by January 2, 2024.  (ECF No. 6-4 at PageID. 246.)  On January 4,
2024, Vari-Form informed Tower: "we will not be able to support your upcoming
requirements unless we receive your amended [purchase order] by Monday,
January 8, 2024, COB."  (*Id.* at PageID. 244.)  Vari-Form indicated that it would
not continue delivering parts to Tower unless Tower paid an approximate 17%
price increase.  (*See* ECF No. 6-5; *see also* ECF No. 6-6.)

---

[3] Counsel for Tower explained at the TRO hearing that the "Print Date" reflects the
order date for specific parts.

### D.   *This Lawsuit*

In response, Tower filed this lawsuit against Vari-Form in the Circuit Court for Wayne County, Michigan, on January 17, 2024.  (*See* ECF No. 1 at PageID. 11-23.)  Tower asserts two breach of contract claims in its Complaint.  (*Id.*)  The following day, Vari-Form removed the matter to this Court based on diversity jurisdiction, 28 U.S.C. § 1332.  (*See id.* at PageID. 2.)  Tower filed a motion for temporary restraining order and preliminary injunction on the same day.  (ECF No. 6.)

In the motion, Tower argues that if Vari-Form fails to continue supplying parts, Tower will suffer irreparable harm because it will not be able to meet its obligations under the Program.  (*See* ECF No. 6 at PageID. 224.)  Tower further argues that the parties' agreement is a requirements contract, which requires Vari-Form to deliver parts for the "life" of the program.  (*See id.*.)  Finally, Tower argues that "life" should be given its plain meaning, not limited to the expected six years at the start of the program.  (*See id.* at PageID. 229 (Defendant "must continue to ship [p]arts for the life of the Program, which Stellantis extended to 2027").)

Vari-Form argues in response that the contract between VF-1 and Tower was extinguished in bankruptcy (*see* ECF No. 11 at PageID. 288); and, in any event, that contract expired on December 31, 2023 (*see id.* at PageID. 285).  Vari-

Form also argues that the laches doctrine, or alternatively, Tower's own delay precludes a finding of irreparable harm, a necessary element for issuing a temporary restraining order or preliminary injunction.  (*See id.* at PageID. 290-91.)

### E.   TRO Hearing and Supplemental Briefing

The Court held a hearing on January 23, 2024, and granted Tower's motion for a temporary restraining order on the same date in an opinion and order.  (*See* ECF No. 15.)  In that decision, the Court ordered Vari-Form to continue delivering parts to Tower for two weeks.  (*See id.* at PageID. 439.)  The Court then asked the parties to file supplemental briefing with respect to Tower's request for a preliminary injunction.  (*See* January 23, 2024 Text-Only Order.)

In its supplemental brief, Tower argues that Vari-Form continued to perform under the PO in a manner consistent with being bound by it.  (*See* ECF No. 16 at PageID. 455.)  Specifically, Tower argues:

> [T]here is no dispute that Tower delivered the POs to [Vari-Form] in June 2019 and March 2020, well after [Vari-Form]'s predecessor's bankruptcy was concluded, and there is no dispute that [Vari-Form] shipped in accordance with those POs for the next three years.  Thus, pursuant to the applicable documents, there is no question that [Vari-Form] accepted and a contract was formed.

(*Id.*)  Tower also provides case law to support the conclusion that the PO applied beyond the initially contemplated six years.  (*See id.* at PageID. 456-58.)

In its supplemental brief, Vari-Form asserts four main arguments and two alternative arguments.  The four main arguments are: (1) Vari-Form did not

7

assume the original PO and its terms, rather the contract remained with VF-1 and was extinguished through the bankruptcy proceedings (*see* ECF No. 17 at PageID. 479-80); (2) to the extent Vari-Form supplied parts to Tower, it was on a release-by-release basis (*see id.* at PageID. 480-83); (3) the original contract expired on December 31, 2023 (i.e., at the end of six years) (*see id.* at PageID. 495-97); and (4) Tower created the harm it now asks the Court to redress (*see id.* at PageID. 497).

Vari-Form's first alternative argument is that Ontario, not Michigan, law applies.  (*See id.* at PageID. 483-88.)  Its second alternative argument is that under either choice of law, the PO is not binding on it.  (*See id.* at PageID 488-95.)

### F.    Court's Preliminary Injunction Order

As indicated, on February 5, the Court issued an Order granting Tower's motion for a preliminary injunction.  (ECF No. 19.)  The Court indicated that it would issue a separate opinion explaining its reasoning.

### I.    Preliminary Injunction Standard

The same standard applied to decide Tower's motion for a TRO applies to its request for a preliminary injunction.  *See Summit Cnty. Democratic Cent. & Exec. Comm. v. Blackwell*, 388 F.3d 547, 550 (6th Cir. 2004).  The Court must balance four criteria in deciding whether to issue a preliminary injunction:

> (1) whether the movant has a strong likelihood of success on the merits;
> (2) whether the movant would suffer irreparable injury without the

8

injunction; (3) whether the issuance of the injunction would cause substantial harms to others; and (4) whether the public interest would be served by the issuance of the injunction.

*Bailey v. Callaghan*, 715 F.3d 956, 958 (6th Cir. 2013) (quoting *Hunter v.*

*Hamilton Cnty. Bd. of Elections*, 635 F.3d 219, 233 (6th Cir. 2011)) (brackets

omitted).

### III.   Applicable Law & Analysis

#### A.   *Plaintiff's Likelihood of Success on the Merits*

Under Michigan law,[4] the party asserting breach of contract must

demonstrate, by a preponderance of the evidence, that: (1) there was a contract

between the parties, (2) a breach of its terms by the other party, and (3) damages

resulting to the party claiming the breach.  *See Miller-Davis Co. v. Ahrens Constr.,*

*Inc.*, 848 N.W.2d 95, 104 (Mich. 2014).[5]

---

[4] In its initial response to Tower's motion, Vari-Form did not assert that Ontario law applies to this dispute, and it cited Michigan law. (*See, e.g.,* ECF No. 11 at PageID. 285, 287.)  Vari-Form spends considerable time in its supplemental brief arguing that Ontario law in fact controls.  (ECF No. 17 at PageID 483-88.)  Tower has not yet had the opportunity to respond to these arguments.  In any event, as noted further *infra*, it does not appear to the Court that there are relevant distinctions with respect to breach of contract claims between the two jurisdictions.  *See Woodbridge Foam Corp. v. Pace Indus., LLC*, No. 23-cv-11118, 2023 WL 8411287, at *3-4 (E.D. Mich. July 11, 2023) (applying Ontario law).  The Court, therefore, is applying Michigan law here.

[5]  The same elements are required under Ontario law.  *See Woodbridge Foam Corp.*, 2023 WL 8411287, at *3 (citing *Braysan Properties Inc. "In Trust" v. Muchos et. al.*, 2022 Carswell Ont 9215 ¶ 62 (Can. O.N.S.C.) (WL); *Wallace Sales* (Cont'd . . .)

i.    The Contract

As to the first element, "[a] valid contract requires. . . : (1) parties competent to contract, (2) a proper subject matter, (3) legal consideration, (4) mutuality of agreement, and (5) mutuality of obligation." *AFT Mich. v. Michigan*, 866 N.W.2d 782, 804 (Mich. 2015) (citing *Detroit Tr. Co. v. Struggles*, 286 N.W. 844, 846 (Mich. 1939)); *see also Solomon v CARite Corporate LLC*, 837 F. App'x 355, 361 (6th Cir. 2020) (quoting *AFT Mich.*, 866 N.W.2d at 804).  Vari-Form maintains that there was no meeting of the mind—that is unconditional acceptance and agreement on all essential terms.

"Mutuality of agreement requires a valid offer and acceptance." *McMillon v. City of Kalamazoo*, 983 N.W.2d 79, 81 (Mich. 2023) (citation omitted); *see also Calhoun Cnty. v. Blue Cross Blue Shield Mich.*, 824 N.W.2d 202, 209 (Mich. Ct. App. 2012) (quotation omitted) (explaining that mutuality of agreement incorporates the understanding that a contract "must have a meeting of the minds on all essential terms of a contract") .  "A meeting of the minds is judged by an objective standard, looking to the express words of the parties and their visible

---

& Consulting, LLC v. Tuopo NA, Ltd.*, No. 15-cv-10748, 2015 WL 4509349, at *3 (E.D. Mich. July 24, 2015) (citing *McCarthy Corp. PLC v. KPMG LLP* (2006), O.J. No. 1492, para. 41(Can. Ont. Supreme Ct. of Justice)).

acts, not their subjective states of minds."[6] *Stanton v. Dachille*, 463 N.W.2d 479,

483 (Mich. Ct. App. 2012).

Tower's PO allowed for three methods of acceptance: (1) commencement of

work; (2) shipment of goods; or (3) failure to object more than five business days

after delivery of purchase order. (*See* ECF No. 1 at PageID. 25, 38.)

Between March 2019 and March 2020, Vari-Form supplied Tower over

240,000 parts at an approximate cost of $14/unit. (*See* ECF No. 17-3 at PageID.

509, ¶¶ 12-13.) The shipment occurred after VF-1 filed for, and was granted,

bankruptcy protection. Vari-Form supplied parts to Tower in response to receiving

purchase orders from Tower, which were essentially identical to the orders sent to

VF-1 except for being addressed to Vari-Form. *See* Mich. Comp. Laws §

440.2206(1)(b) ("an order or other offer to buy goods for prompt or current

shipment shall be construed as inviting acceptance either by a prompt promise to

ship or by the prompt or current shipment of conforming or nonconforming

goods").

Until May 2023, Vari-Form continued supplying parts without objection and

without contesting the terms of the parties' agreement to do so. Thus, even if the

obligation to perform under the contract had remained with VF-1 or the bankruptcy

---

[6] Ontario law also requires a meeting of the minds, which is judged by an objective
standard. (*See* ECF No. 17 at PageID. 488 (citing *Stetson Oil & Gas Ltd. v. Stifel
Nicolaus Canada Inc.*, 2013 ONSC 1300, paras. 42-43 (CanLII) (Can. ON. S.C.)).

trustee, Vari-Form's continued performance under the contract likely bound it to the contract under the same terms. *See Wirt v. Ticona Polymers, Inc.*, No. 04-73753, 2006 WL 2660607, at *9 (E.D. Mich. Sept. 14, 2006) (citing *Paxson v. Cass Cnty. Road Comm'n*, 38 N.W.2d 315, 317 (Mich. 1949)) ("[T]he parties continued to perform in accordance with the written contract's provisions even after this contract had expired.  Under Michigan law, this continued performance gives rise to a rebuttable presumption that the parties were bound by an implied agreement with terms the same as those set forth in the expired contract.").

 While Vari-Form argues that it supplied parts to Tower on a release-by-release basis, the Court finds at this juncture that they were supplied in terms consistent with a requirements contract.

As stated, the POs indicated that they were subject to Tower's Terms and Conditions.  Those Term and Conditions include, in part:

> A. The quantity applicable to each Purchase Order, and the duration applicable to each Purchase Order, are specified on the face of the Purchase Order.  The quantity specified may be for up to one hundred percent (100%) Purchasers requirements for supplies.
>
> * * *
>
> C. Unless stated otherwise on the face of the Purchase Order, the duration of each Purchase Order shall be the life of the program(s) into

which the Supplies are ultimately incorporated, plus applicable service
and replacement parts requirements.

(*See* ECF No. 1 at PageID. 39-40.)  The POs specified the quantity to be 100% and

indicated that the term was the program "life." Vari-Form's May 23, 2023

communication seeking a "*re-quote* for economic adjustments," after learning that

the Jeep Wrangler program was being extended to 2027, indicates that Vari-Form

understood that it was in a requirements contract with Tower.  (*See* ECF No. 6-2 at

PageID. 234.)

The Michigan Supreme Court recently examined the difference between a

"requirements contract" and a "release-by-release contract" in *MSSC, Inc. v.*

*Airboss Flexible Products Co.*, 999 N.W.2d 335 (2023).  As the Court explained

with respect to the former:

> In agreements between a buyer and a seller-supplier, requirements
> contracts are often created by an umbrella agreement, which is also
> referred to as a 'blanket purchase order.' This umbrella agreement sets
> forth the terms governing items such as price, length of the contract,
> warranty details, indemnification, and termination.

*Id.* at 339.  As the Court further explained, a "requirements contract is a contract

that defines quantity by reference to the buyer's requirements."  *Id.* (citing *Black's*

*Law Dictionary* (11th ed.) (defining "requirements contract" as "[a] contract in

which a buyer promises to buy, and a seller to supply, all the goods or services that

a buyer needs during a specified period.").

13

The Court distinguished release-by-release contracts:

> [S]imilar to requirements contracts, some agreements are governed by a blanket purchase order that sets the overall contract terms, and the buyer issues subsequent releases that set forth the specific quantity the buyer needs. But unlike a requirements contract, the blanket purchase order does not set forth the share of the buyer's need to be purchased from the supplier. Instead, the purchase order is more appropriately thought of as an umbrella agreement that governs the terms of future contract offers. Although the seller is not bound to accept future orders in the same manner as with a requirements contract, the seller is bound by the terms agreed to in the purchase order when future releases are issued and accepted.

*Id.* at 340. (citing Killips, *Section 2-201 Isn't Optional: Option Provisions, Requirements Contracts, and Cadillac Rubber*, 41 Mich Bus L J 46, 47 (2021) (describing release-by-release contracts as structured so that their overarching terms are "only enforceable once a firm quantity is stated," which "happens only when a release is issued" and accepted)). Put simply, the umbrella agreements in release-by-release contracts do not contain sufficient quantity terms; instead, quantity terms are supplied by the individual releases. The Court stressed:

> The key difference between a requirements contract and a release-by-release contract rests in the level of mutual obligation between the parties and the risk each party bears. A requirements contract assures the seller that the buyer will be a customer for the length of the contract, but the seller cannot reject future orders for the length of the contract. In contrast, a release-by-release contract gives both parties the freedom to allow their contractual obligations to expire in short order by either not issuing or not accepting a new release. The seller cannot be

guaranteed future business from the buyer, but the seller can accept or reject any offer for future orders.

*Id.* (internal citations omitted).

Each of the six Purchase Orders attached to Tower's Complaint, dated between April 2017 and March 2020 indicates that the purchase order shall fulfill 100% of Tower's requirements. (*See* ECF No. 1 at PageID. 24-36*.*)  This is consistent with a requirements contract. *See Airboss*, 999 N.W.2d at 340.  No firm quantity has been stated, as required with release-by-release orders.  A release-by-release contract's "blanket purchase order does not set forth the share of the buyer's need to be purchased from the supplier."  *Id.*  Thus, at this juncture, the Court finds that the parties agreed to a requirements contract. The Court further finds at this stage that the contract was for the life of the JL Program, which includes its extension beyond the initially contemplated six years.

Vari-Form argues that "life of the program" is an ambiguous term.  But even if that is so, courts consider industry custom or usage and how other court decisions have previously interpreted the term to define ambiguous contract terms. *See, e.g., City of Wyandotte v. Consol. Rail Corp.*, 262 F.3d 581, 586 (6th Cir. 2001) (citations omitted).  "Life of the program" is a term with special meaning in the automotive industry and courts have interpreted it accordingly.  *See Jesa Enters. Ltd. v. Thermoflex Corp.*, No. 16-10885, 2016 WL 4376176, at *2 (E.D. Mich Aug. 17, 2016) (citing *Kingsley Assocs., Inc. v. Moll PlastiCrafters, Inc.*, 65

15

F.3d 498, 502 (6th Cir. 1995)) ("'Life of the part' agreements are common among parts suppliers and sales representatives in the automotive industry."). As the Sixth Circuit explained in *Kingsley*, "the use of a 'life of the part' provision is a common practice in the automobile industry" *Kingsley Assocs.*, 65 F.3d at 502 n.5.

<u>ii.</u>   Defendant's Breach

Tower contends that Vari-Form's January 8, 2024 letter, indicating that Vari-Form would not ship parts until Tower paid a price increase, constituted a repudiation and breach of the contract pursuant to Michigan Compiled Laws § 440.2609.  (*See* ECF No. 6 at PageID. 218.)  The Court agrees.

"Under the doctrine of repudiation or anticipatory breach, if, before the time of performance, a party to a contract unequivocally declares the intent not to perform, the innocent party has the option to either sue immediately for the breach of contract or wait until the time of performance." *Stoddard v. Mfrs. Nat'l Bank of Grand Rapids*, 593 N.W.2d 630, 640 (Mich. Ct. App. 1999) (quoting *Paul v. Bogle*, 484 N.W.2d 728, 735 (Mich. Ct. App. 1992)).  "In determining whether an anticipatory breach has occurred, it is the party's intention manifested by acts and words that is controlling, and not any secret intention that may be held." *Id.* (quoting *Paul*, 484 N.W.2d at 735).

Looking at the language of Vari-Form's communications to Tower, Vari-Form informed Tower that it would withhold performance under the agreement

16

unless Tower agreed to amended terms.  (*See* ECF No. 6-4.)  Based on the record

before the Court at this juncture, there is a substantial likelihood that Tower can

demonstrate that Vari-Form breached the parties' agreement.

### B.    *Irreparable Harm*

 "To be granted an injunction, the plaintiff must demonstrate, by clear and

convincing evidence, actual irreparable harm or the existence of an actual threat of

such injury." *Patio Enclosures, Inc. v. Herbst*, 39 F. App'x 964, 969 (6th Cir.

2002) (quotation omitted). Plaintiff must "demonstrate that irreparable injury is

likely in the absence of an injunction," *Winter v. Nat. Res. Def. Council, Inc.*, 555

U.S. 7, 22 (2008), and that the injury is "both certain and immediate, rather than

speculative or theoretical," *Mich. Coal. of Radioactive Material Users, Inc. v.*

*Griepentrog*, 945 F.2d 150, 154 (6th Cir. 1991).

This element is significant as "even the strongest showing on the other three

factors cannot 'eliminate the irreparable harm requirement.'" *D.T. v. Sumner Cnty.*

*Sch.*, 942 F.3d 324, 326-27 (6th Cir. 2019) (quotation omitted).

To demonstrate irreparable harm, Tower argues that Vari-Form's failure to

ship parts on time will result in shutdown of the entire Jeep Wrangler assembly

line.  (*See* ECF No. 6 at PageID. 209.)  Tower further argues that the unique nature

of the automotive supply chain makes irreparable harm inevitable where a

shutdown results from a supplier's refusal to deliver component parts.  (*See id.* at

PageID. 219.)  This shutdown would idle thousands of workers, which will have a cascading and crippling effect on the automotive supply chain and impact thousands of workers in North America.  (*See id.* at PageID. 220.) Additionally, Tower maintains that it will suffer "incalculable" reputational harm and it will likely lose goodwill.  (ECF No. 6 at PageID. 221.)

As the Honorable Nancy G. Edmunds found in *Cooper-Standard Automobile Inc. v. Daiking America Inc.*, 568 F. Supp. 3d 846 (E.D. Mich. 2021): "The 'just-in-time' nature of the automotive supply chain provides potential for large-scale disruption if just one of the down-line companies is unable to fulfill its obligations under contract."  *Id.* at 848 (citing *Eberspaecher N. Am., Inc. v. Nelson Glob. Prod., Inc.*, No. 12-11045, 2012 WL 1247174, at *6 (E.D. Mich. Apr. 13, 2021)) (finding that "the potentially catastrophic effects of a disruption in the supply chain of automotive parts is well established in the case law of this court").

Vari-Form nevertheless argues that Tower "can avoid the irreparable harm that it claims by remitting the increased price under protest, with reservation of the right to seek damages through this lawsuit."  (ECF No. 11 at PageID. 293.)  Vari-Form further argues that the increased price, $15,000 per week, "is not insubstantial," particularly given that Tower "boasted revenues of over $1 billion annually."  (*Id.*)

18

In *Cooper-Standard*, Judge Edmunds rejected such a pay-under-protest argument—that that "[the buyer] controls its own fate and can choose to pay the increased prices or suffer the damages it describes."  568 F. Supp. 3d at 853. Judge Edmunds reasoned that "while a buyer may have the responsibility to 'cover' in order to lessen its damages, Mich. Comp. Laws § 440.2715(2), this typically refers to a buyer's ability to procure similar goods from a different distributor."  *Id.*  Where the seller's product is unique and the product is ultimately going to a customer with testing and certification requirements—as is often the case where Tier II suppliers provide parts incorporated by Tier I suppliers into equipment ultimately sold to OEMs—"it would not be possible to secure alternate products from a different supplier."  *Id*. (citing *TRW Inc. v. Indus. Sys. Assoc., Inc.*, 47 F. App'x 400, 401 (6th Cir. 2023)).

Vari-Form also argues that laches precludes Tower from obtaining relief. (*See* ECF No. 11 at PageID. 290.)  Specifically, Vari-Form argues that Tower created the harm it now asks the Court to redress.  (*See* ECF No. 17 at PageID. 497.)

Laches consists of two elements: (1) unreasonable delay in asserting one's rights; and (2) a resulting prejudice to the defending party.  *See E.E.O.C. v. Watkins Motor Lines, Inc.*, 463 F3d 436, 439 (6th Cir. 2006) (citation omitted); *see also Petrella v. Metro-Goldwyn-Mayer, Inc.*, 572 U.S. 663, 699 (2014) (Breyer, J.

dissenting) ("The gravamen of laches is the plaintiff's unreasonable delay, and the consequent prejudice to the defendant.  Where due to the passage of time, evidence favorable to the defense has disappeared.")  The Court finds neither extended failure nor unreasonable delay by Tower.

Vari-Form argues that seven months passed between its request for a re-quote and when Tower filed the instant action.  (*See* ECF No. 11 at PageID. 290.)  But Tower filed this lawsuit upon learning that Vari-Form refused to ship parts in a timely manner.  (*See* ECF No. 6-6.)  Vari-Form wrote Tower on January 8, 2024, stating that it will "withhold performance under its agreement."  (ECF No. 6-6 at PageID. 255.)  Tower filed suit shortly thereafter on January 17, 2024.  This delay of a few days is not prejudicial.  *See Ottawa Tribe of Okla. v. Logan*, 577 F.3d 634, 639 n.6 (6th Cir. 2009) ("Laches arises from an extended failure to exercise a right to the detriment of another party.").  Moreover, Vari-Form fails to explain how any delay has caused it prejudice. For these reasons, Tower demonstrates irreparable harm if an injunction does not continue.

### C.    Harm to Vari-Form

The "purpose of the [balance of harms] test is . . . to underscore the flexibility which traditionally has characterized the law of equity."  *ACLU Fund of Mich. v. Livingston Cnty.*, 23 F. Supp. 3d 834, 842–43 (E.D. Mich. 2014) (citation omitted). And ultimately, "[t]he more the balance of harms tips in favor of an

injunction, the lighter the burden on the party seeking the injunction to demonstrate that it will ultimately prevail." *Korte v. Sebelius,* 528 F. App'x. 583, 586 (7th Cir. 2012).

Vari-Form maintains that if a preliminary injunction issues, it will be forced to supply parts at a loss through pricing that it neither negotiated nor accepted. (*See* ECF No. 11 at PageID. 294.)  Tower maintains that Vari-Form will not suffer irreparable harm if it is required to continue shipping parts in accordance with the contract during the pendency of this action.  The Court agrees with Tower.  Any harm to Vari-Form is financial and not irreparable.

### D.    Public Interest

Courts in this District have concluded that a disruption to the automotive supply chain will harm the public's interest.  *See, e.g., Cooper-Standard*, 568 F. Supp.3d. at 848 (citing *Key Safety Sys., Inc. v. Invista, S.A.R.L., LLC*, No. 08-10558, 2008 WL 4279358, at *13 (E.D. Mich. Sept. 16, 2008)). The public interest weighs in favor of the efficient administration of the automotive industry.  *See Key Safety Sys., Inc.*, 2008 WL 4279358, at *13 (concluding that the public-interest factor weighed in favor of injunctive relief where compelling seller to supply automotive part would avoid consequential plant shutdown or layoffs and would avoid economic harm to the state, region, and nation).   Further, "the public interest lies in preserving the enforceability of contracts." *Neveux v. Webcraft Techs., Inc.*,

921 F. Supp. 1568, 1573 (E.D. Mich. 1996); *see also Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp.*, 511 F.3d 535, 551 (6th Cir. 2007) ("Enforcement of contractual duties is in the public interest.").

For these reasons, the Court finds that this factor weighs in favor of granting the injunction.

## IV.   Conclusion

For the above reasons, the Court concludes that the relevant factors weigh in favor of issuing a preliminary injunction.  The Court already has issued its Order setting forth the injunctive relief.  (*See* ECF No. 19.)

**SO ORDERED.**

s/ Linda V. Parker
LINDA  V. PARKER
U.S. DISTRICT JUDGE

Dated: February 15, 2024

22